ON MOTION FOR REHEARING
TAYLOR, J.
On consideration of appellant’s motion for rehearing, we withdraw the previous opinion and substitute the following.[1]
In this medical malpractice action, appellant Ruby Saunders, individually and as personal representative of the Estate of Walter Saunders, timely appeals a final judgment entered on a defense verdict in *875 favor of appellee, Willis Dickens, M.D. (“Dr.Dickens”). Appellant also appeals a final judgment of attorney’s fees entered in favor of Dr. Dickens. We affirm the underlying final judgment, but reverse the attorney’s fee judgment and remand for further proceedings.
This case arises out of Dr. Dickens’s alleged negligence in failing to diagnose and treat Walter Saunders’s cervical cord compression, a condition which eventually caused Mr. Saunders to suffer from quadriplegia.
Mr. Saunders first presented to Dr. Dickens, a neurologist, on July 7, 2003, with symptoms that Dr. Dickens’s physical examination showed were consistent with lumbar stenosis. Dr. Dickens ordered an MRI of Mr. Saunders’s brain and lumbar spine. He did not order a cervical MRI.
The radiology report stated that the lumbar spine MRI showed severe stenosis (or narrowing) of the spinal canal in the lumbar region. According to Dr. Dickens, neurologists defer to neurosurgeons on the subject of whether surgery should be done and the type of surgery required. On July 9, 2003, Dr. Dickens requested a neuro-surgical consultation with Dr. Guillermo Pasarin. Later that month, Dr. Pasarin examined Mr. Saunders and operated on his lumbar spine to relieve the lumbar stenosis.
On September 11, 2003, Dr. Pasarin reported that Mr. Saunders’s condition had not significantly improved. Dr. Pasarin thus ordered an MRI of Mr. Saunders’s lower back, mid-back, and neck. According to Dr. Pasarin, Mr. Saunders did not have any issues of upper extremity dysfunction, even at that time. The new MRIs showed an incomplete decompression and continuing pressure on the lowest level of the spine, which meant that the lumbar surgery had not been successful. These MRIs also showed that Mr. Saunders had pressure on the spinal cord in the neck, or cervical myelopathy. On October 3, 2003, Mr. Saunders reported to Dr. Pa-sarin that his arms and hands had progressively worsened since the July surgery. Dr. Pasarin determined that Mr. Saunders had cervical myelopathy.
Based on the new MRIs and the clinical findings, Dr. Pasarin recommended that Mr. Saunders have cervical decompression surgery. Dr. Pasarin felt that the surgery should be performed within the next thirty days. Although Mr. Saunders was cleared for the surgery on November 6, 2003, Dr. Pasarin failed to schedule him for surgery in the month of November. In December 2003, Mr. Saunders developed a deep venous thrombosis, which prevented him from undergoing surgery. He was thereafter never able to have the cervical surgery.
Mr. Saunders and his wife (“plaintiffs”) initially sued Dr. Pasarin, Broward Neurosurgeons, LLC, and Broward General Medical Center, alleging that their negligence in failing to properly diagnose and treat his cervical cord compression in July 2003 combined to render Mr. Saunders paraplegic.[2] Later, plaintiffs added Dr. Dickens as a defendant in the lawsuit. Mrs. Saunders filed a claim for loss of consortium.
Plaintiffs settled with all defendants except Dr. Dickens. The ease proceeded to trial in late 2009. Plaintiffs presented the expert testimony of a spinal surgeon and a neurologist. They also introduced the deposition testimony of the defense experts.
*876 The neurologist for plaintiffs testified that thé standard of care required a neurologist diagnosing Mr. Saunders to cover all of the areas that could be responsible for the- symptoms, including the brain, the neck, the thoracic spine, and the lumbar spine. He further testified that Dr. Dickens breached the standard of care by failing to order an MRI of Mr. Saunders’s neck after his initial evaluation in July 2003.
.The surgical expert for plaintiffs testified that had Mr. Saunders received a neck operation to remove the compression when Mr. Saunders first presented to Dr. Dickens in July 2003, Mr. Saunders would not have become quadriplegic. To have the best outcome, the cervical cord surgery should have been done as soon as possible after the diagnosis.
The defense, on the other hand, presented expert testimony that Dr. Dickens met the standard of care and that all of Mr. Saunders’s gait problems in July 2003 were related to his lumbar disc disease. The defense also introduced the deposition testimony of Dr. Pasarin, which (unbeknownst to the jury) was given when Dr. Pasarin was still a defendant in the case. Dr. Pasarin believed that Mr. Saunders suffered from two problems occurring at two different times: in July 2003, Mr. Saunders was suffering from lumbar disc disease, and in September 2003, Mr. Saunders began suffering from cervical cord compression. Dr. Pasarin acknowledged that once the cervical compression condition was diagnosed on October 3, 2005, neck surgery needed to be done “in a timely fashion,” meaning within a month.
Dr. Pasarin testified that the upper extremity findings in Dr. Dickens’s July 7 note would not have prompted him to order an MRI of the neck. He also testified that had Dr. Dickens ordered a cervical MRI at that point, and the radiographic findings were identical to those ultimately seen in the September 27 films, Dr. Pasa-rin would still not have performed neck surgery if his exam did not find upper extremity dysfunction.
At the close of the evidence, Dr. Dickens moved for a directed verdict, arguing essentially that Dr. Pasarin’s testimony made it impossible for the plaintiffs to prove that Dr. Dickens’s negligence was a cause of harm to Mr. Saunders. The trial court denied the motion, reasoning that the issue was for the jury.
Before deliberations, the plaintiffs requested a special jury instruction based on this court’s decision in Letzter v. Cephas, 792 So.2d 481 (Fla. 4th DCA 2001). The trial court denied the request. The jury instructions included the standard instruction on apportionment of fault and the standard “concurring cause” instruction.
During closing argument, defense counsel argued that there was no causation, relying on Dr. Pasarin’s testimony that he would have done nothing different if he had seen an MRI of Mr. Saunders’s cervical spine in July 2003. Defense counsel argued that the plaintiffs needed to prove that “[b]ut for Dr. Dickens not doing the MRI, the neck MRI, Dr. Pasarin would have operated on Mr. Saunders’s neck in July. That is what the plaintiffs claim must be and it hasn’t remotely come close.” Counsel for plaintiffs objected that this was not a correct statement of the law and later argued that defense counsel was improperly shifting the burden of proof on the issue of Dr. Pasarin’s negligence, which was an affirmative defense that Dr. Dickens had the burden to prove.
The jury returned a verdict finding no negligence on Dr. Dickens’s part that was a legal cause of loss, injury, or damage to Mr. Saunders. The trial court entered a final judgment in accordance with the ver- *877 diet and subsequently entered a final fee judgment against the plaintiffs.
On appeal, plaintiffs raised four arguments: (1) the trial court should have struck Dr. Dickens’s pleadings under section 766.206, Florida Statutes, which governs presuit investigation of medical negligence claims; (2) defense counsel’s closing argument was improper and warrants a new trial; (8) the trial court erred in refusing to give a Letzter instruction; and (4) the trial court erred in entering a fee judgment jointly and severally against Mr. and Mrs. Saunders where Mrs. Saunders’s claim was for loss of consortium.
As to the first issue, we find no abuse of discretion in the trial court’s refusal to strike Dr. Dickens’s responsive pleading under section 766.206, Florida Statutes (2005). The trial court correctly found that Dr. Dickens complied with all presuit requirements within the required time-frames. For reasons stated below, we also find no error in the trial court’s refusal to grant a mistrial because of several allegedly improper comments by defense counsel in closing argument.
“A trial court has broad discretion in ruling on motions for new trial and mistrial, and its denial of such motions is reviewed under an abuse of discretion standard.” Philippon v. Shreffler, 33 So.3d 704, 709 (Fla. 4th DCA 2010). “Generally, a mistrial or new trial should be granted only when counsel’s arguments are so inflammatory and prejudicial that they deny the opposing party a fair trial.” Maksad v. Kaskel, 832 So.2d 788, 793 (Fla. 4th DCA 2002).
Although attorneys are afforded wide latitude in presenting closing argument, they must “confine their argument to the facts and evidence presented to the jury and all logical deductions from the facts and evidence.” Knoizen v. Bruegger, 713 So.2d 1071, 1072 (Fla. 5th DCA 1998). When arguing to the jury, a party may not make comments that mislead the jury as to the burden of proof. Cf. Paul v. State, 980 So.2d 1282, 1283 (Fla. 4th DCA 2008). It is also improper for counsel to misstate the law during closing argument. See City Provisioners, Inc. v. Anderson, 578 So.2d 855 (Fla. 5th DCA 1991) (misstatement of Florida law on remittitur and additur constituted improper closing argument).
We disagree that Dr. Dickens made an impermissible burden-shifting argument on the issue of Dr. Pasarin’s negligence when Dr. Dickens argued that the plaintiffs failed to present testimony from any neurosurgeon that he would have done anything different than Dr. Pasarin. Rather, Dr. Dickens appeared to argue that the plaintiffs failed to present evidence of causation, in light of Dr. Pasarin’s testimony that if Dr. Dickens had ordered a cervical MRI in July 2003 and the radio-graphic findings were identical to those seen in the September 2003 films, Dr. Pa-sarin still would not have conducted the cervical decompression surgery at that time, given that Dr. Pasarin’s exam did not find any upper extremity dysfunction.
The cases that plaintiffs rely upon are easily distinguishable, as those cases involved situations where either (1) counsel made comments attacking opposing counsel or accusing opposing counsel of “hiding something,” or (2) counsel had commented in closing argument on the failure of the other side to offer evidence that counsel had successfully excluded at trial. See, e.g., Chin v. Caiaffa, 42 So.3d 300, 309 (Fla. 3d DCA 2010) (improper for counsel to comment to the jury that opposing counsel was “try[ing] to fool you”); Sanchez v. Nerys, 954 So.2d 630, 632 (Fla. 3d DCA 2007) (argument that defense counsel was “pulling a fast one” and “hiding something” was improper argument requiring a *878 new trial); Carnival Corp. v. Pajares, 972 So.2d 973, 975-76 (Fla. 3d DCA 2007) (improper for counsel, who has successfully excluded evidence, to seek an advantage before the jury because the evidence was not presented). Neither situation occurred in this case.
The question thus becomes whether defense counsel’s causation argument was improper. We find that under current law in our district, defense counsel’s causation argument was permissible. See Ewing v. Sellinger, 758 So.2d 1196 (Fla. 4th DCA 2000). In Ewing, we affirmed a directed verdict in favor of an obstetrician, concluding that the plaintiffs failed to prove causation where the obstetrician’s alleged negligence would not have affected the treatment decision of a subsequent physician and thus would not have affected the patient’s outcome. We explained: “Thus, what Dr. Sellinger failed to do, i.e., continue Ewing’s supervision under the care of a physician, would not have affected the outcome in the instant case because the physician who was available to intervene and perform a c-section testified that he would not have done so.” Id. at 1198.
Two of our sister courts have, however, rejected the reasoning of Ewing. See Goolsby v. Qazi, 847 So.2d 1001, 1003 (Fla. 5th DCA 2003) (“We disagree with Ewing if it means that the negligent failure to diagnose a condition cannot be the cause of damages if a subsequent treater testifies that he would have shrugged off the correct diagnosis.”); Munoz v. S. Miami Hosp., Inc., 764 So.2d 854, 857 (Fla. 3d DCA 2000) (“What the [non-party] doctor might or might not have done had he been adequately warned is not an element plaintiff must prove as a part of her case.” (internal quotation marks omitted)).
In McKeithan v. HCA Health Services of Florida, 879 So.2d 47 (Fla. 4th DCA 2004), we affirmed a directed verdict in a medical malpractice case, relying on Ewing as one of two grounds for affirming. However, in a concurring opinion, Judge Klein acknowledged: “I am not sure we were correct in Ewing.” Id. at 49 (Klein, J., concurring).
In any event, based on Ewing, counsel’s closing argument on causation in this case was proper. Moreover, unlike in Ewing, here the trial court declined to grant the defendant’s motion for directed verdict, and, instead, submitted the case to the jury, thus allowing plaintiffs to argue to the jury in closing why they should reject Dr. Dickens’s causation argument.
As to plaintiffs’ third argument, we find that the trial court properly denied the request for a Letzter instruction.[3] In general, the standard of review for jury instructions is abuse of discretion. However, a party is entitled to have the jury instructed upon his theory of the case when there is evidence to support the theory. Pollock v. CCC Invs. I, LLC, 933 So.2d 572, 574 (Fla. 4th DCA 2006); Seaboard Coastline R. Co. v. Addison, 502 So.2d 1241, 1242 (Fla.1987). Because a *879 trial court’s discretion in this area is limited by case law, see Pollock, “[i]t would seem that a more accurate statement of the standard of review may well be that giving or refusing jury instructions is reviewed under a mixed standard of de novo and abuse of discretion.” McConnell v. Union Carbide Corp., 937 So.2d 148, 153 (Fla. 4th DCA 2006).
The party who asserts instructional error of this kind must show the following three elements: “(1) the requested instruction accurately states the law applicable to the facts of the case; (2) the testimony and other evidence presented support the giving of the instruction; and (3) the instruction was necessary to resolve the issues in the case properly.” Force v. Ford Motor Co., 879 So.2d 103, 106 (Fla. 5th DCA 2004).
It is well-established that “a wrongdoer is liable for the ultimate result, although the mistake or even negligence of the physician who treated the injury may have increased the damage which would otherwise have followed from the original wrong.” Stuart v. Hertz Corp., 351 So.2d 703, 707 (Fla.1977) (quoting 57 Am.Jur.2d Negligence s. 149, at 507). Stated another way, an initial tortfeasor may be held responsible for all subsequent injuries, including those caused by medical negligence. Caccavella v. Silverman, 814 So.2d 1145, 1146 (Fla. 4th DCA 2002).
The rule of Stuart v. Hertz applies “even when the initial tortfeasor is a physician as well.” Letzter v. Cephas, 792 So.2d 481, 485 (Fla. 4th DCA 2001). In Letzter, we held that if at least one view of the evidence supports the suggestion that the two physicians were not joint tortfeasors, but rather were initial and subsequent tortfeasors, then a Stuart v. Hertz instruction is proper. See id. at 486-88; see also Barrios v. Darrach, 629 So.2d 211, 213 (Fla. 3d DCA 1993) (Stuart v. Hertz instruction should be given where inconsistent theories of causation exist). We defined “joint tortfeasors” as those who act together in committing wrong or whose acts, if independent of each other, unite in causing a single injury. Letzter, 792 So.2d at 486. Whether or not defendants are joint tortfeasors is a question of fact determined by the circumstances of the particular case. Id.
In Letzter we acknowledged that a Stuart v. Hertz instruction would be “awkward when the plaintiff chooses to sue both tortfeasors in the same lawsuit and is particularly problematic when both tort-feasors are physicians.” Id. at 488. We further noted that the instruction seemed “at odds with the legislative purposes of chapter 768 which show a preference for making each tortfeasor liable only for his own negligence.” Id. For that reason, we certified to the Florida Supreme Court the question of whether Stuart v. Hertz is still good law since the passage of the Tort Reform and Insurance Act of 1986, and whether Stuart v. Hertz applies when the initial cause of action is one in medical malpractice. Id. However, the Florida Supreme Court has declined to answer these certified questions.
In this case, the record evidence arguably supports the theory that Dr. Dickens and Dr. Pasarin were joint tort-feasors whose negligence united in causing a single injury to Mr. Saunders. But the evidence does not support the conclusion that Dr. Dickens and Dr. Pasarin were “initial and subsequent” tortfeasors within the meaning of Letzter. Although there was evidence at trial regarding Dr. Pasa-rin’s negligence in failing to completely decompress Mr. Saunders’s lumbar spine, plaintiffs were not seeking damages for Dr. Pasarin’s negligence in this regard, and it was undisputed that Mr. Saunders *880 needed the lumbar surgery regardless of whether Dr. Dickens failed to diagnose the additional problem in Mr. Saunders’s neck. We thus conclude that the trial court properly denied plaintiffs’ request for a Letzter instruction.
On the fourth and final issue, Mrs. Saunders, whose sole claim was for loss of consortium, argues that the trial court erred when it entered a final attorney’s fee judgment[4] jointly and severally against both plaintiffs. The trial court found that Dr. Dickens was entitled to attorney’s fees because Mr. and Mrs. Saunders rejected proposals for settlement in the respective amounts of $140,000 and $10,000, with entitlement to the fees running from the date of those proposals. The trial court entered a final judgment of attorney’s fees against both plaintiffs in the amount of $100,000 plus interest.
The determination of an award of attorney’s fees is within the sound discretion of the trial court and will not be disturbed on appeal, absent a showing of a clear abuse of that discretion. Centex-Rooney Constr. Co. v. Martin Cnty., 725 So.2d 1255, 1258 (Fla. 4th DCA 1999). “However, the determination of whether multiple claims within a lawsuit are separate and distinct is a matter of law to be reviewed de novo.” Anglia Jacs & Co. v. Dubin, 880 So.2d 169, 171 (Fla. 4th DCA 2002). Further, the party seeking fees has the burden to allocate them to the issues for which fees are awardable or to show that the issues were so intertwined that allocation is not feasible. Lubkey v. Compuvac Sys., Inc., 857 So.2d 966, 968 (Fla. 2d DCA 2008). Claims are “inextricably intertwined” when a determination of the issues in one action would necessarily be dispositive of the issues raised in the other. Dubin, 830 So.2d at 172.
Loss of consortium refers to the loss of “companionship and fellowship of husband and wife and the right of each to the company, cooperation and aid of the other in every conjugal relation.” Gates v. Foley, 247 So.2d 40, 43 (Fla.1971). “Consortium means much more than mere sexual relation and consists, also, of that affection, solace, comfort, companionship, conjugal life, fellowship, society and assistance so necessary to a successful marriage.” Id.
A primary cause of action for personal injury and the spouse’s derivative cause of action for loss of consortium claim are generally considered “separate and distinct” claims. See Busby v. Winn & Lovett Miami, Inc., 80 So.2d 675, 676 (Fla. 1955) (husband’s consortium claim is “separate and distinct” from his wife’s personal injury claim and may be maintained with *881 out joinder of the injured wife). Thus, loss of consortium is “a separate cause of action belonging to the spouse of the injured married partner, and though derivative in the sense of being occasioned by injury to the spouse, it is a direct injury to the spouse who has lost the consortium.” Metro. Dade Cnty. v. Reyes, 688 So.2d 311, 812 (Fla.1996) (quoting Orange Cnty. v. Piper, 528 So.2d 196, 198 (Fla. 5th DCA 1988)).
Moreover, “[w]hen a jury finds that one spouse has sustained injuries as a result of the negligence of a third party, an award of damages to the other spouse for loss of consortium is not automatic.” Peterson v. Sun State Int’l Trucks, LLC, 56 So.3d 840, 842 (Fla. 2d DCA 2011). Rather, the spouse asserting the claim of loss of consortium must present competent testimony concerning the impact that the incident has had on the marital relationship. Id. Thus, the issues in a plaintiffs injury claim are not necessarily dispositive of the issues in the spouse’s consortium action.
While it is true that a consortium claim is dependent upon the primary claimant proving the cause of action for the underlying injury, the Second District recently declined to adopt a blanket rule that consortium claims are always so intertwined with the spouse’s claim that allocation is never possible. See Blanton v. Godwin, 98 So.3d 609 (Fla. 2d DCA 2012). The Second District explained that “if such a rule were adopted, in every case containing a consortium claim, where a defendant or one of the plaintiffs are entitled to fees for one claim, that party would automatically be able to obtain fees for work done on both cases.” Id. at 612. The Blanton court went on to hold that while the trial court properly found that the prevailing consortium claimant did not satisfy his burden of allocating attorney’s fees to his consortium claim or showing that the issues were so intertwined that allocation was not feasible, the trial court erred in allocating 25% of the attorney’s fees to the consortium claim because there was no evidence presented supporting that finding.[5] Id. at 613. Instead, the trial court should have awarded only 3.3 hours in attorney’s fees to the consortium claimant because the only testimony presented regarding the actual amount of time spent on the consortium claim was the defense expert’s testimony that only 3.3 hours were directly attributable to the consortium claim. Id.
We agree with the Second District’s reasoning. It would be illogical to find that the prevailing defendant is automatically entitled to obtain fees against the losing consortium claimant for work done on both the underlying injury claim and the consortium claim.
Here, the trial court ruled that the consortium claim was inextricably intertwined with the underlying injury claim, but the court’s ruling was not based upon any evidence. Rather, the court’s ruling was based solely on the defendant’s legal argument that the claims were inextricably intertwined because a consortium claim cannot succeed unless liability for the underlying injury claim is established.
We find that the trial court’s ruling is inconsistent with Blanton. The trial court’s ruling is tantamount to a blanket rule that consortium claims are always so intertwined with the spouse’s claim that allocation is never possible—a blanket rule we decline to adopt. Although Dr. Dickens argues that appellant did not present any evidence in favor of allocating fees, this argument misses the mark. As the *882 party moving for fees, it is Dr. Dickens— not appellant — who has the burden to allocate them between the claims or to show that the issues were so intertwined that allocation is not feasible. See Lubkey, 857 So.2d at 968. Dr. Dickens’s attorney’s legal argument that it was impossible to apportion the time spent on the consortium claim was insufficient to satisfy this burden. Accordingly, we reverse the fee judgment to the extent that it awards the fees jointly and severally against both plaintiffs. However, because the trial court ruled as a matter of law that the claims were inextricably intertwined and never took evidence on the allocation issue, we remand for an evidentiary hearing at which Dr. Dickens will have the burden to allocate his fees between the claims or to show that the issues were so intertwined that allocation is not feasible.
For the foregoing reasons, we affirm the underlying final judgment entered in favor of the defendant, but reverse the final judgment on attorney’s fees and remand for further proceedings.

Affirmed in part, Reversed in part, and Remanded.

CIKLIN and GERBER, JJ., concur.

. Our conclusion in our previous opinion that appellant failed to preserve the argument challenging the fee award was based upon an incomplete record. We have since granted appellant’s agreed motion to supplement the record, and the supplemental record shows that the issue was in fact preserved below. We now partially grant appellant’s motion for rehearing in order to address the appeal of the fee judgment on the merits. We deny appellant's motion for rehearing in all other respects, and also deny appellant’s motion to certify conflict.

. By the time of trial, Mr. Saunders’s condition had progressed to quadriplegia. Mr. Saunders later passed away during the pen-dency of this appeal. His estate was subsequently substituted as the proper party pursuant to the appellee’s Suggestion of Death.

. However, we note that the plaintiffs' agreement to a general verdict form would not, in itself, bar relief on this issue, as Dr. Dickens has suggested. Dr. Dickens’s argument is premised on the "two-issue” rule, which states that "where there is no proper objection to the use of a general verdict, reversal is improper where no error is found as to one of two issues submitted to the jury on the basis that the appellant is unable to establish that he has been prejudiced.” Whitman v. Castlewood. Int’l Corp., 383 So.2d 618, 619 (Fla. 1980). But "the two-issue rule does not apply where, as here, the two 'defenses’ involved comprised separate elements of proof (breach of duty and proximate cause) necessary for the plaintiffs to prevail on a single cause of action (negligence).” Grenitz v. Tomlian, 858 So.2d 999, 1006 (Fla.2003).

. After the plaintiffs filed a notice of appeal as to the final judgment of attorney's fees, the trial court entered an amended final judgment of attorneys' fees nunc pro tunc to the date of entry of the final judgment of attorney’s fees. We find that this amended final judgment of attorneys’ fees was a nullity. See Schultz v. Schickedanz, 884 So.2d 422, 424 (Fla. 4th DCA 2004) (" '[A] trial court is divested of jurisdiction upon notice of appeal except with regard to those matters which do not interfere with the power and authority of the appellate court or with the rights of a party to the appeal which are under consideration by the appellate court.' ”) (citation omitted; emphasis added). When the plaintiffs filed a notice of appeal of the final judgment of attorney's fees, this divested the trial court of jurisdiction because the amended fee judgment interfered with the authority of the appellate court with regard to the matters under consideration in the appeal of the original final judgment of attorney’s fees. Once the notice of appeal was filed, the trial court lacked jurisdiction to enter the amended final fee judgment nunc pro tunc to the date of the first final fee judgment. Cf. Jesus v. State, 31 So.3d 309, 310 (Fla. 4th DCA 2010) ("Once the notice of appeal was filed, the trial court lacked jurisdiction to enter the corrected judgment nunc pro tunc to the date of the first judgment.”).

. The Blanton court discounted the claimant’s expert's testimony, based on "anecdotal experience," that 35% of the total time expended on the case could be attributed to the consortium claim. Id. at 611.