[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 24, 2002
THOMAS K. KAHN
CLERK

No. 01-11026

D. C. Docket No. 98-00197-CV-3-RV-SMN

WILLIAM T. MILES, JR.,

Plaintiff-Counter-Defendant-
Appellee,

versus

NAVAL AVIATION MUSEUM FOUNDATION, INC.,

Defendant-Cross-Defendant-
Counter-Claimant-Cross-
Claimant-Third-Party-
Plaintiff,

PERKINS SMITH, INC.,

Defendant-Cross-Claimant-
Cross-Defendant,

UNITED STATES OF AMERICA,

Defendant-Appellant,

ESTATE OF FRED SORENSON,
WILLIAM T. MILES, SR., et al.,

Third-Party-Defendants.

Appeal from the United States District Court
for the Northern District of Florida

_____

**(April 24, 2002)**

Before ANDERSON, Chief Judge, DUBINA, Circuit Judge, and MILLS*, District
Judge.

DUBINA, Circuit Judge:

This is an appeal from a judgment entered in favor of the Plaintiff after a

four-day bench trial. We affirm.

## I. BACKGROUND

A.     Procedural History

The nose gear of a Beechcraft airplane collapsed during its initial taxi out of

Pensacola's Naval Air Station. One of the aircraft's nose gear wheel valves broke

off and hit Plaintiff William T. Miles, Jr. ("Plaintiff"), injuring his leg. Following

the accident, surgeons amputated Plaintiff's leg above his right knee. Plaintiff

sued the United States Army ("Government") under the Federal Tort Claims Act,

28 U.S.C. §§ 2671- 80, ("FTCA"), asserting that the Government negligently

performed mandatory inspections and negligently failed to train and certify its

_____
*Honorable Richard Mills, U.S. District Judge for the Central District of Illinois, sitting by
designation.

mechanics as required by federal regulations. In a Motion for Summary Judgment, the Government requested that the district court dismiss the case under the FTCA's discretionary function exception or, alternatively, dismiss the case because the Government did not owe Plaintiff a duty under Florida negligence law. The district court denied the Government's motion, and the case proceeded to trial. After a four-day bench trial, the district court entered judgment for Plaintiff in the amount of $436,904.70. The Government timely appealed. After benefitting from the parties' briefs, oral arguments, and an independent review of the record, we affirm the district court's judgment. We hold that, in this case, the FTCA's discretionary function exception does not shield the Government from liability for its negligent inspection and that the Government did owe Plaintiff a duty under Florida negligence law.

B.     Facts

In 1984, the Government acquired the aircraft in this case, a Beechcraft Queen Air, Model #A65-B80 ("Queen Air"), through a criminal drug forfeiture. Until 1992, the United States Army operated and maintained the Queen Air at the Naval Air Station in Glenview, Illinois. In 1992, the Government transferred the Queen Air to the National Museum of Naval Aviation ("Museum") in Pensacola, Florida. After the transfer, the Government registered the Queen Air's title in the

Navy's name. At the Museum, the Queen Air remained in outdoor storage for two years.

In 1994, Fred Sorenson ("Sorenson"), a Museum volunteer, negotiated with the Museum to purchase the Queen Air, along with seven other aircraft. The Museum transferred the aircraft to the Naval Aviation Museum Foundation ("Foundation") under an "as is/where is" contract.[1] The Foundation agreed to

> hold [the Government] harmless from any and all loss or liability (whether in tort or in contract) which might arise from the use of the equipment exchanged under [the] contract and/or results in (1) injury to or parts of[2] personnel of [the Foundation] or third parties; or (2) damages to or destruction of [the] personal property of [the Foundation] or third parties.

Contract between National Museum of Naval Aviation and Naval Aviation Museum Foundation at 14. (R. at 4-14803). The Foundation transferred the aircraft to Cub Enterprises, a trade name for Sorenson. Sorenson then attempted to transfer the Queen Air to Perkins Smith, Inc., a corporation formed by Dr. James Smith. The Sorenson-Smith contract required that Sorenson deliver the Queen Air to the Pensacola Regional Airport, where mechanics would fully inspect the

---

[1] The Museum and Foundation have a relationship in which the Museum trades assets (such as surplus aircraft) to the Foundation in exchange for specified items or services that directly benefit the historical collection of the Museum. The Museum may trade the surplus aircraft but may not sell them; hence, the need for the Foundation's involvement in this transaction with Sorenson. This is referred to as a "barter system," as the Foundation facilitates the sales and trades.

[2] It is unclear what the "or parts of" portion of this clause was intended to cover.

aircraft for its annual airworthiness inspection. To deliver the aircraft, the Federal Aviation Administration ("FAA") issued Sorenson a special flight permit allowing a pilot to ferry the Queen Air from Pensacola Naval Air Station to the Pensacola Regional Airport, a five-minute flight. Sorenson requested Bill Miles, Sr., the Plaintiff's father, to pilot the Queen Air on this ferry flight.

The accident occurred on May 24, 1994, when the aircraft's nose collapsed during the initial taxi out of the parking area. On that day, Sorenson and Bill Miles, Sr., conducted a pre-flight visual inspection. The Plaintiff was acting as the Queen Air's safety observer, "standing fire watch," during his father's initial taxi out of the parking area. After the Queen Air taxied about forty-five feet, during a left turn, the nose gear collapsed. The nose wheel valves exploded and flew off in opposite directions, one of them hitting Plaintiff. After the accident, doctors surgically amputated Plaintiff's leg above his right knee.

During the time the Government possessed the Queen Air, federal regulations required that the aircraft's owners have trained, certified mechanics perform tests to detect nose fatigue cracks on the aircraft at specified time intervals. The Queen Air's manufacturer, the FAA, and the Department of Defense ("DOD"), required this test specifically to prevent accidents similar to that which injured Plaintiff. Although the Government's mechanics did perform this test, the

5

Government failed to meet the FAA and DOD standards because it used untrained, uncertified mechanics.  Because these mechanics improperly performed a nondestructive inspection ("NDI test"), a crack in the aircraft's nose caused the accident.

In 1986, Beechcraft, the aircraft's manufacturer, issued a mandatory service bulletin[3] instructing that the owners of Beechcraft Queen Air aircrafts should inspect the nose landing gear fork for slippage and cracks.  The bulletin stated, in pertinent part, the following:

> Beech Aircraft Corporation [Beechcraft] considers this to be a mandatory inspection/ modification. . . .
>
> Part II: On all airplanes with 1,000 or more flight hours on the nose landing gear lower shock absorber assembly, an initial flourescent liquid penetrant inspection for cracks around the weld area on the fork assembly, should be accomplished within the next 25 service hours after receipt of this Service Bulletin, but no later than the next scheduled airplane inspection.  A recurring flourescent liquid penetrant inspection for cracks around the weld area on the fork assembly should be performed at the following regularly scheduled 100 or 150 hour (as applicable) airplane inspection and at each 100 or 150 hour inspection thereafter.
>
> IT IS FURTHER RECOMMENDED THAT ONLY QUALIFIED PERSONNEL PERFORM THE FLOURESCENT LIQUID PENETRANT INSPECTION TO REDUCE THE POSSIBILITY OF MISINTERPRETATION OF INDICATIONS.

---

[3] Beechcraft issued three revisions to this bulletin, but none of the revisions altered the relevant portion at issue in this case.

*See* Beechcraft Service Bulletin No. 2102, July, 1986 (Plaintiff Ex. 96).

The flourescent liquid dye penetrant inspection is a form of NDI that tests for tiny cracks in the aircraft's nose. The dye penetrates the crack and "glows" when viewed by flourescent lights. The Beechcraft bulletin also contained "Accomplishment Instructions," which directed the owner to perform this NDI test "as instructed." *See* Beechcraft Service Bulletin No. 2102.

Following Beechcraft's bulletin, the FAA issued Airworthiness Directive 87-22-01 ("AD"), requiring that owners of all Beechcraft airplanes perform the NDI test "in accordance with the instructions in Part II of Beechcraft's bulletin No. 2102." FAA AD 87-22-01, Nov. 16, 1987 (Plaintiff Ex. 100). The FAA required the testing "to prevent failure of the nose landing gear due to undetected fatigue cracking." FAA AD 87-22-01.

Prior to the time that Beechcraft issued its bulletin and the FAA issued its AD, the DOD had issued regulations governing the performance of NDI tests on military aircraft. Military Standard 410D, Nondestructive Testing Personnel Qualification and Certification, July 23, 1974 (Plaintiff Ex. 180). According to Military Standard 410D, the DOD requires that personnel who performed NDI tests be both qualified and certified. MIL-STD-410D. The Standard's foreword states that "MIL-STD-410D specifies the qualification and certification

7

requirements for nondestructive testing personnel performing eddy current, *liquid penetrant*, magnetic particle, radiographic and ultrasonic test methods." MIL-STD-410D at iii (emphasis added).  Military Standard 410D divides personnel into three levels, according to their qualifications and training.  Military Standard 410D also requires that the personnel pass a written examination of "appropriate true-false, multiple choice, fill-in, and mathematical questions, covering the applicable method." MIL-STD-410D § 3.9.4.2.  In addition, the employer must certify that the personnel are qualified to perform the NDI test "in accordance with the written procedures."  MIL-STD-410D § 4.2.  The employer's written procedures must establish a training course outline, define time requirements for each phase of the training, and describe the pertinent examinations each candidate must pass.  MIL-STD-410D § 4.2.1.

Military Standard 410D's training and certification requirements also apply to any civilian personnel who performs NDI tests on military aircraft.  The NDI technical manual requires that all

> civilian Department of Defense personnel and non-Department of Defense personnel performing inspections in accordance with this Technical order: they SHALL be qualified and certified to the current MIL-STD-410. . . . At a minimum, the local organization shall document its procedure on training and certifying their inspectors per MIL-STD-410.

Technical Manual, Nondestructive Inspection Methods, TM 1-1500-335-23 at 1-5, October 1997.

During the time the Army maintained the Queen Air in Glenview, Illinois, four Army mechanics serviced the aircraft: Robert Cummings, Ron Homa, Earl-Nelson Guir, and Michael Farley. Because these mechanics worked as Department of the Army civilian mechanics during the week and as Army Reservists for approximately one weekend per month, the Army classified them as "dual status technicians." Although these mechanics performed at least four NDI inspections on the Queen Air, they never recorded any nose fatigue cracks in the aircraft's log books, nor did they ever replace the critical nose gear components as the Beechcraft bulletin and FAA AD instructed. In addition, these mechanics signed their names on the Queen Air's maintenance log as Department of Army civilians, and therefore, the DOD's training and classification requirements applied to them. None of these mechanics met the DOD's training or certification requirements of TM 1-1500-335-23 for civilian personnel, nor did they meet the training and certification requirements of Military Standard 410D.

## II. ISSUES

1.    Whether the district court erred in finding that the discretionary function exception to the FTCA did not apply to Plaintiff's negligence claim.

2.    Whether the district court erred in finding that the Government owed Plaintiff a duty under Florida negligence law.

## III.  STANDARDS OF REVIEW

We review the district court's denial of summary judgment *de novo*. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001).  We also review the district court's conclusions of law *de novo*.  *Id*.  The district court's findings of fact must be accepted unless they are clearly erroneous.  *Andrews v. United States*, 121 F.3d 1430 (11th Cir. 1997).

## IV. DISCUSSION

As a preliminary matter, we recognize that the Government did not own the Queen Air at the time of this accident.  The Government argues that an exculpatory clause in its contract with the Foundation relieves it from any previous negligent inspections.  The district court found that this contract clause indemnified the Government rather than exculpated it.  Regardless of whether this clause indemnifies or exculpates the Government, a third-party cannot be bound by a contract to which it was not a party.  *Equal Employment Opportunity Comm'n v.*

10

*Waffle House, Inc.*__U.S__, 122 S.Ct. 754, 764 (2002) (holding that "a contract cannot bind a nonparty."). Therefore, the district court correctly found that the exculpatory contract clause did not affect Plaintiff's claim because he was not a party to the contract.

Regarding the two issues on appeal, we will first discuss the FTCA's discretionary function exception and the two-part test that the Government's conduct must meet to fall under this exception. *See United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267 (1991). After determining what conduct is actually at issue, we will apply the *Gaubert* test to the facts presented in this case and illustrate why we conclude that the discretionary function exception does not apply. We will then address the second issue of whether the district court erred in finding that the Government owed Plaintiff a duty under Florida negligence law.

A.    Discretionary Function Exception

The FTCA waives the government's sovereign immunity and allows injured parties to hold the government liable in tort "in the same manner and to the same extent as a private individual." 28 U.S.C. § 2674 (1994). The FTCA's waiver of immunity is subject to several exceptions, including a discretionary function exception. *Id.* at § 2680(a). The discretionary function exception precludes government liability for

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* at § 2680(a).

In *Gaubert*, the Supreme Court developed a two-step test to determine whether the Government's conduct meets the discretionary function exception. *Gaubert*, 499 U.S. at 322-23, 111 S.Ct. at 1273-74. In *O'Ferrell v. United States*, 253 F.3d 1257 (11th Cir. 2001), we explained how a court should apply this test.

 First, a court must look to the nature of the challenged conduct and decide whether the conduct "violated a mandatory regulation or policy that allowed no judgment or choice." *Autery v. United States*, 992 F.2d 1523, 1526 (11th Cir. 1993). The discretionary function exception will not apply "if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d. 335 (1991). Second, if the court determines that no "statute, regulation or policy specifically prescribes a course of action," the court must then consider whether the challenged conduct "is of the kind that the discretionary function exception was designed to shield." *Id.* at 322-23, 111 S.Ct. 1267. The purpose of the exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id*. at 323, 111 S.Ct. at 1267.

253 F.3d at 1266.

Before applying each prong of the *Gaubert* test to the Government's conduct, we must first "determine exactly what the conduct is at issue." *Autery v. United States*, 992 F.2d 1523, 1527 (11th Cir. 1993).

1. The Conduct at Issue

Section 2680(a) of the FTCA states that the discretionary function exception only precludes government liability for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty. . . ." 28 U.S.C. § 2680(a) (1994). The parties dispute what Government conduct is at issue in Plaintiff's claim. The Government argues that Plaintiff's claim is based upon the Government's conduct in deciding to sell the aircraft "as is/where is." Plaintiff argues that his claim is based upon the Government's conduct in failing to train and certify mechanics, as required by the FAA AD, Military Standard 410D, and TM 1-1500-335-23. Because the Government allowed untrained, uncertified mechanics to perform the Queen Air's required NDI test, the Government failed to detect a fatigue crack in the aircraft's nose. We agree with Plaintiff.

According to the Government, since it did not own the Queen Air at the time this accident occurred, and had previously sold the aircraft in a contract with an "as is/where is" disclaimer, it is not liable for Plaintiff's injuries. The Government contends that its decision to sell surplus equipment "as is/where is" insulates it

13

from liability for previous inspections and maintenance, even if it negligently performed those inspections and maintenance.

We are not persuaded by the Government's argument. While we acknowledge that other courts have held that the Government uses discretion in determining to sell surplus military equipment and disclaim warranties for that equipment, that issue is not before this court. *See e.g., Grammatico v. United States*, 109 F.3d 1198 (7th Cir. 1997). For example, the surplus property in *Grammatico*, a milling machine, had a defective hand brake which caused the plaintiff's injuries. *Id.* at 1200. This case, however, presents different facts than *Grammatico*. 109 F.3d at 1200. In that case, the plaintiff sued the Government under the FTCA alleging strict liability and negligence in selling the machine with a defective brake and in failing to inspect the property before the sale. *Id.* at 1202. The Seventh Circuit found that it lacked jurisdiction over the claim because the Government had discretion over the conduct that the plaintiff was challenging: the sale of the faulty milling machine without a pre-sale inspection. *Id.* at 1201. The Seventh Circuit held that the Government uses its discretionary function in selling surplus property without pre-sale inspections or warranties. *Id.*

The facts of this case are distinguishable from *Grammatico* because Plaintiff here is not challenging the sale of the aircraft. Plaintiff challenges the

14

Government's failure to properly require that trained, certified mechanics perform the NDI test, as required by federal regulations. This failure led to the negligent inspections. Conversely, *Grammatico* held that the government used discretion in disposing of surplus property, and therefore, "the government [was] not subject to suit." 109 F.3d at 1202. In essence, the Government's failure to follow Military Standard 410D, TM 1-1500-335-23, and the FAA AD is independent from its later decision to sell the surplus property without a warranty. In fact, Plaintiff could have still maintained his FTCA negligence claim even if the Government had never sold the aircraft because the Government still would have been required to have trained, certified mechanics perform this test. In contrast, the plaintiff in *Grammatico* could not have maintained his claim absent the sale of the surplus property.

## 2. Application of *Gaubert* to the Government's Conduct

After determining what Government conduct is at issue, *Gaubert* requires that we ask whether the "acts involv[e] an element of judgment or choice." 499 U.S. at 322, 111 S.Ct. at 1273. Our inquiry must focus on "whether the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner." *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997) (citations omitted). If the Government's conduct satisfies the first prong, we must

then determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23, 111 S.Ct. at 1273 (citations omitted).

In our view, the Government's conduct fails the first prong of the *Gaubert* test because its conduct does not involve "an element of judgment or choice." *See Gaubert*, 499 U.S. at 322, 111 S.Ct. at 1273. Rather, federal regulations require that the Government utilize trained, certified mechanics to perform NDI tests. The regulations also require that the mechanics perform the NDI test at certain time intervals and use certain methods. Since the Government's conduct fails to satisfy the first prong of *Gaubert*, we do not need to consider the second prong. The Government has no discretion in the challenged conduct. The FTCA's discretionary function exception does not shield it from liability. Therefore, the district court properly analyzed the FTCA's discretionary function exception and found that it did not preclude Plaintiff's claim.

B. Duty under Florida Negligence Law

Alternatively, the Government argues that the district erred because the district court rejected the Government's defense that it did not owe Plaintiff a duty under Florida's negligence law. The FTCA creates liability for the United States only if the act at issue is a tort in the state where the conduct occurred. 28 U.S.C. §

16

2674 (1994). In this case, the Government's conduct and the accident occurred in Florida. To succeed on a negligence claim in Florida, Plaintiff must "show that the defendant owed a duty of care to the plaintiff, that the defendant breached the duty, that the breach caused plaintiff's injury, and that damages are owed." *Ewing v. Sellinger*, 758 So. 2d 1196, 1197 (Fla. Dist. Ct. App. 2000). The Government argues only the issue of whether the district court erred in finding that the Government owed Plaintiff a duty when it performed the NDI test.

Florida law provides that "[t]he duty element of negligence focuses on whether the defendant's conduct forseeably created a broader 'zone of risk' that poses a general threat of harm to others." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992). Under this standard, the Government owed Plaintiff a duty because an accident of this type was foreseeable. In fact, the FAA AD expressly warned the Government that this type of accident could occur absent proper NDI testing. Accordingly, we find no error in the district court's finding that the Government owed Plaintiff a duty under Florida negligence law.

## V.    CONCLUSION

In sum, we hold that the discretionary function exception to the FTCA does not bar Plaintiff's negligence claim against the Government for failing to follow Military Standard 410D, TM 1-1500-335-23, and the FAA AD.  The Government did not properly perform the required inspections because it failed to require that trained, certified mechanics perform the mandatory NDI tests.  In addition, we hold that the Government did owe Plaintiff a duty under Florida negligence law because the Government broadened the zone of risk by failing to train and certify the mechanics.  Thus, we affirm both the district court's finding of subject matter jurisdiction, and its subsequent judgment entered in favor of Plaintiff.

AFFIRMED.